# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRIDINETWORKS LTD.,

                    Plaintiff,

    v.

STMICROELECRONICS, INC.,
STMICROELECTRONICS N.V., and
STMICROELECTRONICS
INTERNATIONAL N.V.,

                Defendants.

**No.** 1:19-01064-CFC

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO STMICROELECTRONICS <u>INTERNATIONAL N.V.'s MOTION TO DISMISS</u>

David L. Finger (#2556)
Finger & Slanina, LLC
One Commerce Center
1201 North Orange Street, 7th Floor
Wilmington, DE 19801-1186
(302) 573-2525
Fax: (302) 573-2524
dfinger@delawgroup.com

OF COUNSEL:

Ronald Abramson
David G. Liston
Ari J. Jaffess
Alex G. Patchen
M. Michael Lewis
Rebecca Rothkopf
LISTON ABRAMSON LLP
The Chrysler Building
405 Lexington Avenue, 46th Floor
New York, New York 10174

*Attorneys for Plaintiff Tridinetworks Ltd.*

Dated:  November 12, 2019

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTS ........................................................................................................................... 2

ARGUMENT ................................................................................................................. 4

    I.    Legal Standard for Dismissal ................................................................... 4

    II.   TDN Has Sufficiently Pleaded Patent Infringement By ST-INTL ................................. 5

        A.   Direct Infringement ........................................................................ 5

           a. TDN Has Sufficiently Pleaded Direct Conduct by ST-INTL ................................. 5

           b. TDN's Adequately Alleges a System that Infringes the '276 Patent ......................... 6

        B.   Indirect Infringement .................................................................... 8

        C.   Contributory Infringement ............................................................ 10

    III.  The '276 Patent Covers Patent-Eligible Subject Matter ................................. 10

        A.   Legal Standards ........................................................................ 10

        B.   ST-INTL Impermissibly Abstracts the Claims ......................................... 13

        C.   The Alleged "Generic" Computer Components Are Not Generic ............................. 16

        D.   ST-INTL's Reliance on Cases Concerning Content Manipulation and Presentation is Misplaced .......................................................... 18

        E.   The '276 Patent Improves Computer Capabilities ...................................... 19

    IV.  IV. Curative Amendment in the Alternative ............................................. 20

    V.   Conclusion ................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**            **Pages**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018)....... 13

*Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d 1253 (Fed. Cir. 2016) ................. 18

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014)..................................... 11

*Align Tech., Inc. v. 3Shape A/S*, 339 F. Supp. 3d 435 (D. Del. 2018) 5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...................................................... 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).............................................. 4

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018). ..................................... 13, 19

*Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (2019)...................................... 13

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d at 1343 (Fed. Cir. 2014)........................................................................ 18, 19

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018)......... 12, 19

*Data Engine Tech. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018)........................ 19

*Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016). ................. 18, 19

*Enfish LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016)................................ 11, 13, 19

*Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299 (Fed. Cir. 2018)........................... 12

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3rd Cir. 2009)................................... 4, 5

*Groove Digital, Inc. v. King.com, Ltd.*, 2018 WL 6168615 (D. Del. Nov. 26, 2018)......... 5

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323 (Fed. Cir. 2012)............................................................................. 5, 9

*Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363 (Fed. Cir. 2015).... 18

*Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016).............. 12, 19

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012)................. 4

*McGovern v. City of Phila.*, 554 F.3d 114 (3rd Cir. 2009) .....................................

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.*, 545 U.S. 913 (2005) ……………….  9

*Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351 (Fed. Cir. 2012) ………………………..  7

*Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018) ……………………………  5

*Phillips v. Cnty of Allegheny*, 515 F.3d 224 (3rd Cir. 2008). ……………………………….  10

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315 (Fed. Cir. 2016) …………………………………………………………………………………..  8

*Roche Prod., Inc. v. Bolar Pharm. Co.*, 733 F.2d 858 (Fed. Cir. 1984) ……………………  6

*Sanofi v. Watson Labs., Inc.*, 875 F.3d 636 (Fed. Cir. 2017). ………………………………  9

*Thales Visionix, Inc. v. United States*, 850 F.3d 1343 (Fed. Cir. 2017). ……………………  12

*Uniloc USA, Inc. v ADP, LLC*, 772 Fed. Appx. 890 (Fed. Cir. 2019) ………………………  12

*Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117 (Fed. Cir. 2018) ………...  9

*Visual Memory LLC v. Nvidia Corp.*, 867 F.3d 1253 (Fed Cir. 2017). ……………………..  11

*Wayne Land and Mineral Grp. LLC v. Del. River Basin Comm'n*, 894 F.3d 509 (3rd Cir. 2018) …………………………………………………………………………………...  4, 13

**Statutes**

Fed. R. Evid. 201……………………………………………………………………….....  3

Fed. R. Civ. P. 8…………………………………………………………………………..  4

Fed. R. Civ. P. 12…………………………………………………………………….…...  4

Plaintiff TriDiNetworks Ltd. ("Plaintiff" or "TDN") submits this memorandum, and the accompanying declaration of Ronald Abramson ("Abramson Dec."), in opposition to the motion to dismiss, D.I. 19, filed by defendant STMicroelectronics International N.V. ("ST-INTL").

## INTRODUCTION

This is an action against ST-INTL and two of its affiliates for infringement of U.S. Patent No. 8,437,276 (D.I. 1, Exhibit 1, hereinafter, "the '276 patent" or "the patent"). ST-INTL and its affiliates referred to are part of a global enterprise referred to herein as "ST." ST-INTL is one of three named defendants. The other two are STMicroelectronics, Inc. (ST-US), the principal ST company in the U.S., and STMicroelectronics N.V., the worldwide ST holding company. ST-US previously moved to dismiss (D.I. 9) and that motion is fully briefed and pending. STMicroelectronics N.V. has separately moved to dismiss on jurisdictional grounds, and will be voluntarily dismissed. ST-INTL filed a motion to dismiss on October 29, 2019 (D.I. 19). The present brief addresses ST-INTL's motion to dismiss. *Though ST-INTL is a foreign entity, its motion, unlike that of STMicroelectronics N.V., does not raise jurisdiction.*

The '276 patent concerns "commissioning" electronic devices for deployment in what has later become known as the "Internet of Things" (IoT) – an automated process for quickly doing the work required to initially set up a device, such as a sensor, light, valve, actuator, etc. so that it may join an electronic devices network and participate in the distributed automation structure of the IoT.

In particular, the '276 patent provides a method for performing commissioning that may be carried out by "contactless technologies" ('276 patent 4:26), in one quick step without physical contact, which may be used to commission numerous devices, for example in "large wireless networks" (*Id.* at 3:4-6), even when the devices to be commissioned are not powered-up. (*Id.* at

4:33-35.) For example, such devices may be commissioned while still in the sealed cardboard boxes in which they have been received. (D.I. 1, ¶ 12.)

ST-INTL's motion focuses primarily on the sufficiency of the infringement allegations and on why it, in particular, among the various ST entities, is accused of direct and indirect infringement. It also raises the patent eligibility of the asserted subject matter, on the same basis that TDN has addressed earlier, with regard to the same arguments advanced by ST-US. None of these grounds justify dismissal.

## FACTS

The '276 patent issued on May 7, 2013 and claims priority to an initial U.S. provisional patent application filed on November 29, 2007 ('276 Patent, cover page, items 45, 60.) The '276 Patent represents a significant advance in practical implementation in the then nascent field of the Internet of Things. ("IOT") (D.I. 1, ¶ 11.) Prior methods necessitated, for example, commissioning over a live network connection ("in-band") to the device to be commissioned, typically requiring individual attention to each device by a highly-trained engineer, or factory pre-configuration of each device in accordance with a limited (and very limiting) set of options determined by the manufacturer. (D.I. 1, ¶ 13.) Such methods were tedious, required highly trained workers to perform, and were vulnerable to third-party attack. (*Id.*)

By contrast, the system disclosed in the patent allows networked devices to be commissioned with greatly reduced labor and expense. (*Id.* at ¶¶ 11, 13.) A design can be created once and transferred to a commissioning device, which can be as simple as a smartphone. ('276 patent, 11:50-60, D.I. 1, ¶ 12.) The commissioning device and the device to be commissioned have contactless electronic interfaces, such as a NFC (near field communication) interface, which allow commissioning data to be loaded while the receiving device is not even powered up. ('276 patent, 14:57-64.) This allows devices to be commissioned contactlessly by way of a mere "tap" from the

commissioning tool – without a wired electrical connection. (D.I. 1, ¶ 12.) The technology presented in the patent makes it possible for devices to be commissioned by non-technical personnel even while the devices are still in the boxes in which they are delivered, which significantly reduces commissioning time and expense. (D.I. 1, ¶¶ 11, 12.) Because NFC typically has a short effective range (under 20 cm), the disclosed commissioning is limited to those in close physical proximity to the commissioned device, which enhances the security of device configuration. (*Id.* at ¶ 12.)

With regard to the (originally) named parties, STMicroelectronics N.V. is a holding company and all ST group business is conducted through national subsidiaries. (*See* Declaration of Andrew Mayo, D.I. 23.) ST-US is the principal U.S. subsidiary of this group. (*See* Complaint, ¶ 3.) ST-INTL is another subsidiary of ST Microelectronics N.V. The role of ST-INTL in the ST group is to manage the worldwide business. (*See* Complaint ¶ 4.)[1] In this role, it appears that ST-INTL owns and is responsible for the content of the corporate st.com website, cited in the complaint. *See* ¶ 5 of the complaint.[2]

---

[1]  In addition to being sufficiently alleged, the Court can take judicial notice that STMicroelectronics N.V.'s most recent 20-F SEC report (Feb. 28, 2019), pertinent excerpts of which are reproduced in Abramson Dec., ¶¶ 4-5, states at page 17 that "[o]ur headquarters and operational offices are managed through our wholly owned subsidiary, STMicroelectronics International N.V.," and on page 26 that "we conduct our global business through STMicroelectronics International N.V." These are the types of assertions "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

[2]  *See*  https://www.st.com/content/st_com/en/about/st_company_information/who-we-are.html; *see also* the "whois" printout for st.com (Abramson Dec., ¶ 7), identifying the domain name owner of ST Microelectronics as being in Geneva Switzerland, Post Code 1228, like ST-INTL.

## ARGUMENT

### I.  Legal Standard for Dismissal

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (internal quotation marks and citations omitted, ellipses in original). To survive a motion to dismiss, a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 547. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint, however, is not required to be "rich with detail," but "need only set forth sufficient facts to support plausible claims." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211-212 (3rd Cir. 2009). Indeed, the issue before the Court is not whether TDN will ultimately prevail, but "if … the plaintiff is [] entitled to relief under any reasonable reading of the complaint." *McGovern v. City of Phila.*, 554 F.3d 114, 115 (3rd Cir. 2009).

In deciding a motion pursuant to Rule 12(b)(6), the Court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Wayne Land and Mineral Grp. LLC v. Del. River Basin Comm'n*, 894 F.3d 509, 526-27 (3rd Cir. 2018) (*quoting Blanyar v. Genova Prods. Inc.*, 861 F.3d 426, 431 (3rd Cir. 2017)); *Iqbal*, 556 U.S. at 679 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). In doing so, the court may consider "the complaint, exhibits attached to the complaint, matters of public record, as well

as undisputedly authentic documents if the complainant's claims are based upon [those] documents." *Wayne Land*, 899 F.3d at 526-27.

A plaintiff "need not prove its case at the pleading stage." *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018) (internal quotations and citations omitted). With regard to patent claims in particular, the "Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012).

## II. TDN Has Sufficiently Pleaded Patent Infringement By ST-INTL

### A. Direct Infringement

#### a. TDN Has Sufficiently Pleaded Direct Conduct by ST-INTL

ST-INTL states that TDN's allegations against it are insufficient because they fail to attribute direct infringement to ST INTL individually. TDN is alleging that ST-INTL *itself* uses the patented invention. This is stated in ¶ 31 of the complaint. (D.I. 1) ("ST's acts as aforesaid (including without limitation each of defendant "ST Microelectronics International N.V.")).

A complaint may be structured to refer to all named defendants collectively within a count, where each affiliate engages in the same course of wrongful conduct.[3] *See e.g., Align Tech., Inc. v. 3Shape A/S,* 339 F. Supp. 3d 435, 447 (D. Del. 2018); *Groove Digital, Inc. v. King.com, Ltd.,* 2018 WL 6168615 at *1 (D. Del. Nov. 26, 2018). Plaintiff specifically alleges that ST-INTL (and ST-US) are both liable for all acts, (D.I. 1. ¶ 31), as was the case in *Align Tech*. and *Groove Digital*.

TDN alleges that ST-INTL (and separately ST-US) infringe, to the extent they or persons under their direction and control test and demonstrate such systems at locations in the U.S. Testing and demonstration of a system constitute "use" for purposes of direct infringement under 35 U.S.C.

---

[3] TDN notes that it is not asserting that there is any joint infringement of a method claim.

§ 271(a). *See Roche Prod., Inc. v. Bolar Pharm. Co.*, 733 F.2d 858, 863 (Fed. Cir. 1984) (superseded on limited grounds by statute).

At a minimum, it is plausible, that persons acting on behalf of ST-INTL perform infringing demonstrations at ST's international trade shows in the United States. As noted above, ST-INTL is not contesting contacts sufficient to invoke U.S. jurisdiction. According to the st.com website cited in the complaint, one such trade show is the ST Developers Conference, which takes place every year in Santa Clara, California. *See* https://www.st.com/content/st_com/en/campaigns/developers-conference-2019.html. The conference is of international scope, and is organized by ST personnel – including what appear to be foreign ST personnel – held out to the public out as employees of "STMicroelectronics" – with no specific corporate affiliation provided. Since 2016, this conference has regularly had presentations regarding NFC commissioning of IoT devices. See, for example, https://blog.st.com/nfc-technology-is-simplifying-the-iot/, which shows such a demonstration, with NFC commissioning as claimed in the '276 patent at 2:05 in the embedded video. The person performing this video demonstration identifies himself as a senior marketing official of "STMicroelectronics" without identifying the specific entity. Considering ST-INTL's role – including its ownership of the st.com domain – it is plausible that this and like demonstrations are conducted by an ST-INTL employee or someone operating under its direction and control.

### b.  TDN's Adequately Alleges a System that Infringes the '276 Patent

ST-INTL's allegations that TDN did not adequately describe the infringing systems is incorrect. TDN is not asserting that a board, standing alone, infringes the '276 Patent. Instead, it has adequately alleged that the '276 Patent is infringed through a series of steps performed by ST-INTL. For example, Paragraph 27 of the complaint incorporates a host of details, with reference

to documents and videos provided by ST, of examples in which ST products, in a specified combination, are used to practice every pertinent claim limitation. The documents and videos referenced in the complaint, include, among others, the "Quick Start Guide for STM32 ODE function pack for IoT node with Wi-Fi or Ethernet, NFC, sensors and motor control, connected to Microsoft Azure cloud" ("Quick Start Guide"), illustrating, step by step, a system comprised of ST products and a corresponding method of using that system, which constitutes infringement of the '276 patent. A copy of the Quick Start Guide is attached as Ex. A to the Abramson Declaration.

Whoever (in the U.S.) does what is taught in the Quick Start Guide, with regard to the X-Nucleo device shown therein, commissioning that device via NFC with ST's smartphone app, and deploying the device accordingly as shown, directly infringes at least claims 1 and 17 of the '276 patent. This includes ST customers and OEMs, to the extent they purchase the specified ST products and use them in the U.S. as so instructed. As such, TDN has adequately pled direct infringement against ST-INTL.

ST-INTL incorrectly asserts that TDN's citations to the Quick Start Guide are insufficient because (it argues) such guides cannot demonstrate infringement. *Mirror Worlds*, cited by ST-INTL, in fact does not stand for the holding that user manuals are insufficient to show infringement, but rather that a user manual must show each step of a method performed together to adequately show infringement of that method: "When manuals only teach customers each step of the claimed method in isolation, but not all the steps of the claimed method together, the manuals alone cannot support infringement." *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1360 (Fed. Cir. 2012) (quotations and citations omitted). As outlined in the complaint, the Quick Start Guide

shows each element of the referenced claims performed *together*, and is sufficient to allege a direct infringement. (D.I. 1, ¶ 27).[4]

Moreover, the assertion that user manuals are insufficient evidence of infringement is contrary to Federal Circuit law. *See, e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1335 (Fed. Cir. 2016) ("Indeed, we have affirmed induced infringement verdicts based on circumstantial evidence of inducement (*e.g.*, advertisements, user manuals) directed to a class of direct infringers (*e.g.*, customers, end users) without requiring hard proof that any individual third-party direct infringer was actually persuaded to infringe by that material.").

## B.  Indirect Infringement

ST-INTL asserts that the complaint fails to state a claim for indirect infringement because there is no underlying act of direct infringement. (D.I. 20, 11.) It also repeats its argument that TDN has not identified an infringing system and that the complaint leaves to speculation which customers are using an infringing system. Finally, it argues that TDN has not alleged specific intent of induced infringement on its part.

As for the existence of direct infringers, the Federal Circuit precedent is that "[t]o state a claim for indirect infringement . . . a plaintiff need not identify a *specific* direct infringer if it pleads

---

[4] ST-INTL further argues that TDN has identified no infringing system and that the identified products cannot alone infringe the patent. It characterizes the use of the words "may be used to infringe" as merely "speculative." Para. 27 clearly does, however, identify an infringing system, comprising a combination of specified ST NFC enabled products (which include the claimed networked device and "configuration adapter") along with the ST25 NFC mobile app installed on a user's mobile phone ("design system" and "commissioning tool"). Whether *individual* ST components infringe is immaterial. The system of components identified in ¶ 27 infringes at least claim 17. At least method claim 1 is also infringed when the system is used to design and commission devices in a network via NFC, and the devices are deployed accordingly. (D.I. 1, ¶27.) The allegation that the individual ST components involved "may" be used to infringe is accurate - the individual components are capable of being used in infringing combinations and uses. The complaint is also clear, however, in alleging that ST-INTL (and separately ST-US) do in fact use the claimed systems in infringing combinations, constituting direct infringement. Complaint ¶ 30.

facts sufficient to allow an inference that at least one direct infringer exists." *In re Bill of Lading*, 681 F.3d at 1336. Under Count II, TDN has identified several groups of people who directly infringe, including, for example, those who practice the commissioning steps in the ST Quick Start Guide. (D.I. 1, ¶ 38.) As noted above, the Quick Start Guide shows each and every claim limitation with reference to a specific combination of device elements. The complaint alleges that anyone who buys specified ST products and uses them in the U.S. in accordance with the instructions in the Quick Start Guide is a direct infringer. (*Id.*) This is not merely about individual ST products that may or may not individually be used to infringe. It is about a combination of ST products recommended by ST to be used together in a specified manner that constitutes infringement.[5]

ST-INTL further claims that TDN has not alleged specific intent of induced infringement. (D.I. 20, 13) "Inducement" lies in purposefully causing or encouraging infringement. *See, e.g.*, *Sanofi v. Watson Labs., Inc.*, 875 F.3d 636, 644 (Fed. Cir. 2017). Such acts may include "active steps … taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.*, 545 U.S. 913, 936–37 (2005) (internal citations and quotations omitted). In *Sanofi*, text on a drug label was all it took for the court to uphold a finding of inducement. *Sanofi*, 875 F. 3d at 645-46, *see also Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117 (Fed. Cir. 2018) (label recommended performance of all infringing steps). The Quick Start Guide and related cited videos contain exactly the same type of instructions, if anything, more extensively, than those found in the cited authorities, and is clearly provided to encourage performing all claimed steps of the '276 patent. This manual and the related videos are produced and disseminated by ST as a global

---

[5] ST-INTL argues that a customer who deploys the devices are not infringers because "deployment is not an infringing act," (D.I. 20, 12), but overlooks the fact that to deploy them they of course have to be commissioned as well, implicating the rest of the claimed system and method.

enterprise. They are so distributed through the ST corporate website, st.com (D.I. 1, ¶ 41), and the complaint is sufficient to plausibly allege that the st.com website is operated by ST-INTL. This is sufficient to support the allegations of induced infringement against ST-INTL, certainly on a plausibility standard.

### C.  Contributory Infringement

ST-INTL argues that the allegations of contributory infringement, including that the products involved have "no substantial non-infringing use," are merely conclusory. The allegations are in fact much more specific than ST-INTL has characterized them. Par. 56 of the complaint alleges in particular that "ST's Nucleo evaluation boards and associated modules and ST25 NFC Tap mobile application when provided together constitute components used in practicing the system and method claims of the '276 Patent … which ST knows … [are] not staple articles or commodities of commerce suitable for substantial noninfringing use," citing written pre-suit communications in which TDN brought these specific allegations to ST-INTL's attention, and ST continued the activity nonetheless. *See* Abramson Dec. Ex. B. These are direct, specific allegations directed to identified products and as such are plausible and sufficient allegations.

## III.   The '276 Patent Covers Patent-Eligible Subject Matter

ST-INTL, like ST-US in its own prior motion, makes a second argument based on alleged lack of patent-eligible subject matter. TDN already responded to this argument (D.I. 12). To avoid undue repetition, an abbreviated form of TDN's earlier response is set forth below, with several added recent authorities.

### A.  Legal Standards

To determine patent eligibility, the Court "must first determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014). If so, then, the Court must next "consider the elements of

each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* at 217 (*quoting Mayo Collab. Servs. v. Prometheus Labs., Inc.,* 132 S. Ct. 1289, 1297 (2012)). Plaintiff also refers the Court to a recent survey article on this subject, Jasper L. Tran & J. Sean Benevento, Alice at Five, 2019 PATENTLY-O PATENT LAW JOURNAL 25 (2019), retrievable at https://patentlyo.com/media/2019/11/Tran.2019.AliceatFive.pdf.

In these inquiries, the Federal Circuit considers "whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea." *Enfish LLC v. Microsoft Corp.,* 822 F.3d 1327, 1335 (Fed. Cir. 2016). The court contrasts claims "directed to an improvement in the functioning of a computer" against claims "simply adding conventional computer components to well-known business practices." *Id.* at 1338; s*ee also Visual Memory LLC v. Nvidia Corp.*, 867 F.3d 1253, 1259 (Fed Cir. 2017).

In *Enfish,* the Federal Circuit held that the claimed software implementation of a database represented an improvement on computer functionality, and were therefore patent-eligible because the claims were not simply directed to any form of storing tabular data, but to a specific table for a computer database that functions differently than conventional databases. *Enfish,* 822 F.3d at 1330-39. Similarly, in *Thales Visionix, Inc. v. United States*, the court found that a claimed system for using mounted inertial sensors to calculate the orientation of an object to be a technological improvement and therefore patent-eligible. *Thales Visionix, Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017). The court in *Thales* emphasized that the claims "result in a system that reduces errors in an inertial system that tracks an object on a moving platform" and use the sensors "in a non-conventional manner." *Id.* at 1348-49. In *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, the Federal Circuit upheld claims directed to an interface that allowed users to more quickly

access stored data and programs in small-screen electronics, which included limitations that disclosed "a specific manner of displaying a limited set of information to the user, rather than using conventional user interface methods to display a generic index on a computer." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1363 (Fed. Cir. 2018). Highly significant is whether the patent in question only claims a result in functional terms, or goes on to recite *how* the claimed function is implemented. *See, e.g.*, *Uniloc USA, Inc. v ADP, LLC*, 772 Fed.Appx. 890, 897 (upholding patent that "claims a particular improvement in *how* [a specified function] is done" (emphasis in original)); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018) ("the claims recite more than a mere result … they recite specific steps … that accomplish the desired result").

By contrast, in *Intellectual Ventures I LLC v. Symantec Corp.*, cited by ST-INTL, the court found that claims for screening emails for unwanted content based on applying "rules" to the messages were patent *ineligible* because the concept of "the screening of messages by corporate organizations," was well known and abstract, and could as well be "performed by a human, mentally or with pen and paper." *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016). Turning to Step 2 of *Alice/Mayo*, the court found that the implementation of [this] abstract idea is routine and conventional," that the patent did not "improve the functioning of the computer itself," and that "each step does no more than require a generic computer to perform generic computer functions." *Id.* at 1318.

ST-INTL relies on the line of authority represented by *Intellectual Ventures I LLC v. Symantec* to argue that the '276 patent is directed to a patent-ineligible abstract idea of organizing the known and practiced human activity of configuring devices and connecting them to a network. (D.I. 9, 13-14.) This argument, however, ignores the innovation of the claims and reduces them to

a surface-level understanding. "Describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337.

Furthermore, at this stage, issues of fact must be resolved in favor of the plaintiff. This has particular bearing on § 101 issues. "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018); s*ee also Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318 (2019) (confirming applicability of *Berkheimer* to Rule 12(b)(6) motions). Any such questions arising in the context of a motion to dismiss must be resolved in favor of the plaintiff. *Wayne Land*, 894 F.3d at 526-27.[6]

## B. ST-INTL Impermissibly Abstracts the Claims

ST-INTL argues that the claims of the '276 patent "are directed to organizing the human activity of configuring devices and connecting them in a network," which ST-INTL then characterizes as a mere "abstract idea," and that this "common practice" is merely automated by the conventional application of "generic computer components." (D.I. 20, 16.) ST-INTL thus

---

[6] In addition, ST-INTL's motion makes disputed assumptions about claim construction, and does not identify representative claims. ST-INTL's arguments assume constructions, which Plaintiff disputes, such as what is meant by references in the claims to terms such as "binding information," and hardware components such as "configuration adapters," "master controllers," and "access points." On a motion to dismiss, the Court must either construe the claims before ruling, or accept the plaintiff's constructions. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). As to representative claims, the Court may treat certain claims as representative where the patent owner "does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). However, as addressed herein, the '276 patent also has a rich set of dependent claims, many of which are patentably distinguishing and recite significant additional limitations. Furthermore, at the present stage, Plaintiff has not been required to present its detailed infringement contentions and need only have plausibly alleged infringement of at least one patent claim. Though the Court's analysis will not likely have to go this far, to actually grant this motion, the Court would have to find that *all* claims of the '276 patent are patent-ineligible.

creates an abstraction on the patent itself – abstracting away critical features and structure – to argue that what is left, after such dissection, is "abstract."

ST-INTL's brief would abstract the claims down to:

- identifying the devices to be connected in a network and collecting the information needed to configure those devices to connect (D.I. 20, 17);
- entering configuration data (*e.g.*, by downloading it to the device) and installing devices just as in the prior art but with the help of generic computer components (*id.*); and
- forming [the] network and bindings according to [the] created design … by reading [the] downloaded data … once the devices are initialized. (*Id.*)

ST-INTL's over-simplified characterization overlooks major features that distinguish the '276 patent from the prior art, and fails to address how the objects of those features can be met, including (1) that the created design is first loaded onto a device (commissioning tool) that itself has the ability to commission all of the various devices that may need to be commissioned, and (2) that this has been engineered to be achievable before any of the devices have to be physically deployed and put under electrical power.

Simply put, while Plaintiff does not dispute that people have been configuring devices for network use for decades, it asserts that no one prior to this patent had a commissioning scheme as claimed in this patent that could be used to commission a plurality of devices for such use, contactlessly from one tool for a plurality of devices, while the devices themselves were unpowered. This manner of operating was in no way an established human activity prior to this patent, nor (as further addressed below) is it achieved by simply automating prior art manual steps using computer equipment for its ordinary purposes.

It is also significant to consider the advantages conferred by the '276 patent. As the patent explains, at 1:46-64, prior to the '276 patent, configuring devices for deployment in a network application required opening a communications channel with an *already running device* and (1)

- 14 -

entering a unique ID (UID) such as a unique radio ID; (2) entering a startup attribute set (SAS) such as a personal area network (PAN) ID of the network; (3) identifying (connecting) the physical location of the device with its UID and its logical location and function on the network scheme; and (4) pairing/binding of controlling devices and sensors. '276 patent at 1:46-64.

By contrast, the claimed subject matter requires entering the data, one time only, in the form of a network design ('276 patent, 11:50-60; (D.I. 1, ¶ 12); loading the design into a commissioning tool (which may be a smartphone or a special-purpose handheld tool) (*id.*); and, having done that, simply "tapping" the tool to as many devices as may be desired to be configured, which each may have distinct IDs and configurations. (D.I. 1, ¶¶ 11, 12.) This may be done to the unpowered devices even while still in sealed packaging. (D.I. 1, ¶ 12.) The devices can then be physically installed. When the devices are powered up, the network formation follows automatically. (*E.g.*, '276 patent, 4:36-37; 5:1-2.) These substantial workflow advantages were not available in the prior art.

The commissioning claimed in the '276 patent cannot be fairly described as merely automating an existing pattern of human activity. ST itself has made this clear in its own presentations to the industry, as set forth in the ST slide deck cited in ¶ 38 of the complaint. According to the cited ST presentation, as late as 2016, there was "**no defined standard** or protocol or framework **for IoT devices commissioning**." (ST's own emphasis in the original). (D.I. 1, ¶ 38.)

- 15 -



**IoT Devices Commissioning**
The challenge

• There is **no defined standard** or protocol or framework **for IoT devices commissioning**

• There are many proprietary, protocol-specific and multistep, solutions for scanning QR-codes or typing in long passwords

• **Multiple commissioning flows**, device related, may results in a bad user experience - **risk to slow down IoT adoption**

• Confusion results, especially for devices without a UI

Thus, according to ST's own characterization, there existed no defined standard for the alleged time-honored "human activity" that it would characterize as controlling in this case. Indeed, the ST presentation from which the foregoing statement derives, which goes on to document direct infringement by ST, itself makes the case for the need for the invention of the '276 patent – substantially the same case that is made at cols. 1-3 of the '276 patent itself. ST has said the same in its own words, outside of this Court.

## C. The Alleged "Generic" Computer Components Are Not Generic

The "generic computer components" that ST-INTL invokes as allegedly used to carry out the claimed processes did not exist. The recited steps in claim 1 of the '276 patent and structures of claim 17 thereof recite, for example, a "configuration adapter." ST-INTL's brief never addresses what this "configuration adapter" actually is, simply likening it to some arbitrary device that "implement[s] industry standard communication protocols such as ISO 14443," a copy of which ST-INTL attached to its brief. (D.I. 20, 18.) This characterization of the "configuration adapter" is grossly inaccurate. Per the claim language, the configuration adapter,  as illustrated in Fig. 7 of the '276 patent, "receives *and stores* configuration data." ('276 patent 9:47-49 (emphasis added.) Fig. 7 includes (i) a "configuration interface" (*e.g.*, NFC radio interface), (ii) a "device contact" interface (e.g., a wired $I^2C$ bus), and (iii) a "control & memory module," *e.g.*, an EEPROM (electrically erasable programmable read-only memory):



Fig. 7

There is no dispute that the "configuration interface" *portion* of this device (207) may *comply* with ISO 14443 (*see* '276 patent, 14:55-56). But ISO 14443 does not address a storage element. Further, to work as claimed, the storage element must be able to operate while the device is unpowered. There is nothing remotely resembling such a configuration adapter in ISO 14443, which is the only reference to which ST-INTL has pointed.

Another example is an "access point" that also incorporates a configuration adapter. (*See, e.g.*, '276 patent, claim 22.) ST-INTL hasn't identified any such access points that were widely used in 2007. Nor does ST-INTL identify "master controllers," also incorporating such configuration adapters, as recited in several dependent claims, as of 2007. (*Id.*) In fact, the incorporation, pursuant to this patent, of a configuration adapter device into the sensors and controllers of the day, represented a significant improvement in systems used to commission network devices, using new arrangements of components.

One can see this, not in ISO 14443, but again in 2016 ST marketing literature cited in ¶ 38 of the complaint. The presentation refers to, for example, ST NFC "Dynamic Tag," which, just like the '276 patent's "configuration adapter," sports an $I^2C$ bus (on the right), NFC antenna interface (on the left), and a "Memory Block" (in the middle):



(Cited at D.I. 1, ¶ 38.) Perhaps such a "Dynamic Tag" component is *now* becoming generic as a result of ST's aggressive marketing, but there is no basis to say that it *was* generic in 2007.

In sum, there is no basis to claim that the methods and systems described in the '276 patent are implemented with components that were "generic" at the time of the claimed invention. What we see instead is the use of a new and specific arrangement of hardware to enable a substantially streamlined process, to replace a much more tedious and expensive process that was performed previously.

### D.  ST-INTL's Reliance on Cases Concerning Content Manipulation is Misplaced

In addition to *Intellectual Ventures v. Symantec*, *supra*, ST-INTL also relies extensively on *Content Extraction and Transmission LLC v. Wells Fargo Bank Nat. Ass'n*, which concerned a patent claim for (1) collecting data, (2) recognizing certain data within the collected data set, and (3) storing that recognized data in a memory, in which the court observed: "humans have always performed these functions." 776 F.3d 1343, 1347 (Fed. Cir. 2014). Similarly, ST-INTL relies on *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 (Fed. Cir. 2015), which involved two claims, the first for "tracking financial transactions to determine whether they exceed a pre-set spending limit," and the second for "[t]ailoring information [on a website] based on the time of day of viewing" – adding only that the steps are done on a computer. 792 F.3d 1368-70. It also cites *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d 1253 (Fed. Cir. 2016) and *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016).

In both *Content Extraction* and *Intellectual Ventures v. Capital One*, as with *Intellectual Ventures v. Symantec*, the court was able to fit the claims into the category of, e.g., a function or "long prevalent practice" that "humans have always performed" (*Intellectual Ventures v. Symantec*, 838 F.3d at 1314; *Content Extraction*, 776 F.3d at 1347), carried out by a computer used only as a tool, for its ordinary purposes. Similarly, in *Affinity Labs*, the Federal Circuit concluded that "[t]he essential advance" was "only in the content of [the] particular application." 838 F.3d at 1263. Also, in *Electric Power*, the court characterized the claims as "[m]erely requiring the selection and manipulation of information." 830 F.3d at 1355. The Federal Circuit clearly distinguished this line of cases in *Data Engine Tech. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018), finding those authorities not controlling where a claimed invention was "not simply directed to displaying a graphical user interface or collecting, manipulating, or organizing information." 906 F.3d at 1010.

As set forth above, the complaint, the patent, and ST's own documents completely refute the premise of routine human activity, or of a claim that only concerns manipulating content. To the extent the Court may have any doubt about this, at the very least, a factual issue would exist under *Berkheimer* (*infra*), necessitating denial of this motion.

### E. The '276 Patent Improves Computer Capabilities

The '276 patent introduces a completely new set of tools, comprising commissioning tools and complementary "configuration adapters," to move the IoT commissioning process from tedious one-on-one labor to streamlined mass production, thereby improving computer capabilities. This is comparable to *Enfish*, where the advantages similarly included "increased flexibility, faster search times, and smaller memory requirements." 822 F.3d at 1337; *see also Core Wireless*, 880 F.3d 1356 at 1363 (avoiding the need "to scroll around and switch views").

While TDN did not invent NFC or other RF chips, the patent combines those components in a new way that enables the rapid commissioning of multiple devices, using a single design. This is not "just computer components performing generic functions." (D.I. 20, 17-18.) Instead, the unique use of computer components to improve the operation of networked devices demonstrates that the claims are drawn to patent eligible subject matter. Indeed, there is no example like this case in which the court ruled *against* patent-eligibility.

Should the court find that the inventive concepts discussed above are not enough to distinguish the claims from an abstract concept, the additional step of interposing the commissioning tool in a repeatable manner, and the complementary configuration adapters on it and the device to be commissioned, the latter with a storage facility that will accept the design and work even when powered down, is certainly an "inventive concept," should one be needed to dispose of this motion. Any remaining issues regarding the patented invention's improvements or use of known components represent material questions of fact under *Berkheimer*.

## IV.    Curative Amendment in the Alternative

TDN respectfully submits that its complaint in this case meets applicable pleading requirements. Nonetheless, if the Court finds that any count is insufficiently pled, Plaintiff should be allowed to amend its complaint to allege facts that will cure the defect. *Phillips v. Cnty of Allegheny*, 515 F.3d 224, 245 (3rd Cir. 2008). Part of the difficulty here is that the various ST companies regularly refer to themselves in an ambiguous manner, as "STMicroelectronics." (Abramson Decl.¶ 6.) It would be appropriate, if the Court deemed it necessary, to allow TDN to amend to add "STMicroelectronics" as a Doe defendant, and allow the pertinent facts as to which is the relevant foreign ST entity to be resolved in the course of discovery,

## V.    Conclusion

Based on the foregoing, ST-INTL's motion to dismiss should be denied.

- 20 -

Dated: November 12, 2019

Respectfully submitted,

/s/ David L. Finger
David L. Finger (#2556)
Finger & Slanina, LLC
One Commerce Center
1201 North Orange Street, 7th Floor
Wilmington, DE 19801-1186
(302) 573-2525
Fax: (302) 573-2524
dfinger@delawgroup.com

OF COUNSEL:

Ronald Abramson
David G. Liston
Ari J. Jaffess
Alex G. Patchen
M. Michael Lewis
Rebecca Rothkopf
LISTON ABRAMSON LLP
The Chrysler Building
405 Lexington Avenue, 46th Floor
New York, New York 10174

*Attorneys for Plaintiff TriDiNetworks Ltd.*